## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**DURAYLE JACKSON,**

     **Plaintiff,**

     v.                            **CASE NO.  25-3013-JWL**

**EMMIT LOCKRIDGE, et al.,**

     **Defendants.**

### MEMORANDUM AND ORDER

Plaintiff, Durayle Jackson, brings this pro se civil rights case under 42 U.S.C. § 1983.  The Court granted Plaintiff leave to proceed in forma pauperis.  Plaintiff's claims are based on incidents occurring during his detention at the Wyandotte County Jail in Kansas City, Kansas ("WCJ").  In response to the Court's February 11, 2025 Memorandum and Order to Show Cause (Doc. 7), Plaintiff submitted an Amended Complaint (Doc. 8) on March 7, 2025.  On March 25, 2025, the Court entered a Memorandum and Order (Doc. 9) ("M&O") ordering Plaintiff to show good cause why his claims against Defendant Lockridge and his claims asserting a hate crime, an equal protection claim, a § 1985(3) claim, and his First Amendment right to assemble claim, should not be dismissed for the reasons stated in the M&O.  Plaintiff responded, and on May 1, 2025, the Court entered a Memorandum and Order (Doc. 12) dismissing those claims for failure to state a claim.

The Court's M&O also found that the proper processing of Plaintiff's Eighth Amendment and privacy claims could not be achieved without additional information from appropriate WCJ officials and ordered the officials to submit a *Martinez* Report.  The Court's M&O provides that "[u]pon the filing of that Report, the Court will screen the remaining claims in Plaintiff's Amended

Complaint." (Doc. 9, at 14.) The *Martinez* Report (Docs. 22, 28) (the "Report") has now been filed. The Court's screening standards are set forth in the Court's M&O.

## I. Nature of the Matter before the Court

Plaintiff's allegations in his Amended Complaint are set forth in detail in the M&O. In summary, Plaintiff alleges that staff at the WCJ made comments to other inmates indicating that Plaintiff was gay, that he had a sexually transmitted disease, that he was a snitch, that he had sex with a 12-year-old girl, that he smells like gender dysphoria, and that they "induced" his tray with hep-c. Plaintiff alleges that the comments were made verbally to other inmates, or were announced over officers' walkie talkies. Plaintiff seeks $4,000,000 in compensatory damages and $2,000,000 in punitive damages. (Doc. 8, at 11.)

## II. The Report

The Report provides that Plaintiff was booked into the WCJ on July 29, 2023, and was placed in disciplinary segregation from September 15, 2023, to October 5, 2023, for tampering with the locking device on his cell door. (Doc. 22, at 7; Exhibits 1, 9, 10.) Plaintiff was placed in disciplinary segregation from October 5, 2023, to October 25, 2023, for throwing a dinner tray at WCJ staff. *Id*. at 8; Exhibits 11, 12. Plaintiff was placed in disciplinary segregation from October 31, 2023, to November 3, 2023, for having "various items posted on his window sill." *Id*.; Exhibit 13. Plaintiff was released from the WCJ on January 24, 2024. *Id*. at 10; Exhibit 9.

The Report states that Plaintiff filed grievances on 9/18/23, 9/19/23, 9/23/23, 10/30/23,[1] 11/2/23; 11/16/23, and 11/29/23. *Id*.; Exhibits 2–8. The Report indicates that most of the grievances failed to name a staff member or dates and times of the alleged incidents.

The Report also addresses Plaintiff's allegations in his Amended Complaint that named

---

[1] The Report does not address the October 30, 2023 grievance.

specific staff members, dates, and times.  *Id*. at 11–32.   For *some* of these allegations, the Report points out discrepancies between the day or time asserted by Plaintiff and the actual day or time a certain staff member was working.  For example, Plaintiff alleges that on September 12, 2023, Deputy Garcia and a nurse told inmates that Plaintiff had herpes and that he is gay.  (Doc. 8–2, at 16.)  The Report states that the "WCSO does not have any records of a Deputy Garcia working at WCJ on 9/12/23."  (Doc. 22, at 13.)  Plaintiff alleges that on September 15, 2023, DHO Officer Smith told inmates that nobody likes Plaintiff, and he is a fag and a rat anyway. (Doc. 8–2, at 16.) The Report states that the "WCSO does not have any records of a Deputy Smith working on 9/15/23."  (Doc. 22, at 14.)  Although Plaintiff alleges that Deputy Pilfiger made a comment on September 22, 2023, at 4 pm, the Report states that Deputy Pfliegier worked at the WCJ from 9 am to 2 pm that day, and the WCSO does not have a record of her working at 4 pm that day.  *Id*. Although Plaintiff alleges that Deputy Woods made a comment on September 22, 2023, at 6 pm, the Report states that Deputy Woods did not start working until 6:15 pm that day.  *Id*. at 15. Although Plaintiff alleges that on October 12, 2023, at 6:05 pm, Deputy Anderson made a comment, the Report states that the two deputies with the surname Anderson worked on that day but did not start working until 6:15 pm.  *Id*. at 17.  Although Plaintiff alleges that Deputy Thomas made statements on October 21, 2023, at 5:10 pm, the Report states that the "WCSO does not have any records of a Deputy Thomas working at WCJ on 10/21/23 at or around 5:10 pm."  *Id*. at 22.

The Report also includes affidavits from staff regarding the alleged statements they made about Plaintiff.  *See* Doc. 22–1.  Plaintiff alleges that on October 2, 2023, at 4:45 pm, Deputy Cole said that she exposed Plaintiff's paper to inmates, referring to Plaintiff as a snitch, and stating that Plaintiff better stay in the SHU or he will get beat up for being a snitch if he goes back to GP. (Doc. 8–2, at 18.)  The Report provides that although Sargeant Anita Cole was working that day,

she maintains that she would never say something like that and would not use the term "SHU" because she is not familiar with that term.[2] (Doc. 22, at 16.)

Affidavits were also included from other WCJ staff. *See* Doc. 22–1, at 23 (Exhibit 16, Affidavit of Deputy Brett Jones) ("I do not recall an incident on or around August 28, 2023 where I received a message through my radio that Durayle Jackson or any other inmate needed to be jumped . . I did not make a comment on or around August 28, 2023, on my radio or otherwise, that Durayle Jackson or any other inmate needed to be jumped."); *Id*. at 26 (Exhibit 19, Affidavit of Deputy Cody Porath) (stating that he does not recall incidents around September 12, 2023, and October 3, 2023, where he made a comment about Plaintiff's sexuality, including whether or not he was gay); *Id*. at 27 (Exhibit 20, Affidavit of Deputy Eric Smith) (stating that he does not recall making or hearing a comment about Plaintiff's sexuality, whether he was a "rat" or anything similar around September 15, 2023); *Id*. at 27 (Exhibit 20, Affidavit of Deputy Eric Smith) ("I do not recall making or hearing a comment on or around September 15, 2023 about Durayle Jackson's sexuality, whether he was a 'rat,' or anything similar" . . . "I would not make any comments like that."); *Id*. at 29 (Exhibit 22, Affidavit of Deputy Elizabeth Pfliegier) ("I do not recall an incident on or around September 22, 2023 where I made a comment indicating that Durayle Jackson was gay."); *Id*. at 31 (Exhibit 24, Affidavit of Deputy Brandon Woods) (stating that he did not make any comments on or around September 22, 2023, about whether Plaintiff was gay or a snitch, or on or around November 18, 2023, about whether Plaintiff planned to sue, and stating that "[n]one of the allegations Durayle Jackson made about me happened, and I would not say anything like what he alleged."); *Id*. at 35 (Exhibit 27, Affidavit of Deputy Anita Cole) (stating that she "did not make any comments on or around 10/2/23 referring to Durayle Jackson as a snitch" and that she

---

[2]  Although Plaintiff refers to Deputy Cole as a female, and it doesn't appear that he was referring to Arich Cole, the Report provides that "Deputy Arich Cole was out on family medical leave (FMLA) on 10/2/2023." (Doc. 22, at 16.)

"would never say something like that" and "S.H.U. is not a term that [she] is familiar with, and [she] would not use it."); *Id*. at 38 (Exhibit 30, Affidavit of Deputy Kameron Anderson) ("I do not recall an incident on or around October 12, 2023 where I made a comment indicating that Durayle Jackson had sex with a minor."); *Id*. at 39 (Exhibit 31, Affidavit of Deputy Teran Anderson) ( "I do not recall an incident on or around October 12, 2023 where I made a comment indicating that Durayle Jackson had sex with a minor" and "I have only been working night shifts since I started at Wyandotte County Jail, so I would not have been near the pods before 6:30 pm."); *Id*. at 41 (Exhibit 33, Affidavit of Deputy Fabian Carlon) (stating that he did not recall an incident on or around October 13, 2023, where he or a coworker commented that Plaintiff was gay, or an incident on or around October 20, 2023, where he or a coworker referred to Plaintiff as gay and needing to go to a facility for sex offenders); *Id*. at 44 (Exhibit 35, Affidavit of Shan Stoafer) ("I do not recall any incident on or around October 14, 2023 where I spoke about adulterating Durayle Jackson's food, commented on the size of his genitalia, or referred to him as gay (using a slur or otherwise)" and "Inmates do not receive food between 3 and 3:30 PM, when he alleges the comments were made" and "I would not make comments like that about any inmate"); *Id*. at 46–47 (Exhibit 37, Affidavit of Deputy Lyndsey Huitt) (stating that she did not make the alleged comments or adulterate Plaintiff's food on October 17, 22, or 30, 2023, that she "absolutely would not make comments like the ones Durayle Jackson alleges that [she] did" and she did not recall a communication on her radio on or around October 24, 2023, about rumors related to Plaintiff and "[w]hile working [she] always wear[s] earphones connected to [her] work-issued radio, so no one around [her] can hear communications that come into [her] radio"); *Id*. at 50 (Exhibit 40, Affidavit of Deputy Catherine Jennings) ("I definitely did not make any comments on or around 10/20/23 referring to Durayle Jackson as gay or a snitch (using slurs or otherwise) or asking other inmates

to refer to him as such . . . I would not say anything like that"); *Id*. at 52 (Exhibit 42, Affidavit of Deputy Joshua Thomas) ("I did not make any comment on or around 10/21/23 referring to Durayle Jackson as gay or a snitch . . . I do not particularly recall interacting with Durayle Jackson . . . I would not say anything like that about anyone"); *Id*. at 56 (Exhibit 46, Affidavit of Deputy Heaven Rhodes) ("I did not make any comments on or around October 25, 2023 about adulterating Durayle Jackson's food or referring to him as gay or molested . . . I would not make any comments like the one Durayle Jackson claimed I did."); *Id*. at 51 (Affidavit of Deputy Michael Lopez) ("I did not make any comment on or around 11/8/23 referring to Durayle Jackson as gay or molested . . . It is not in my character to make such a comment."); *Id*. at 64 (Exhibit 54, Affidavit of Deputy Lorenzo Kelly) ("I did not make any comments on or around December 18, 2023 about whether or not Durayle Jackson had snitched about something . . I did not have much contact with Durayle Jackson while he was incarcerated and would never say anything like what he alleges I did."); *Id*. at 66–67 (Exhibit 56, Affidavit of Deputy Jonathan Strader) ("I did not make any comments on or around December 21, 2023, over the radio or otherwise, about Durayle Jackson being gay or a snitch . . .   I did not make any comment on or around December 28, 2023 about Durayle Jackson being gay . . . I did not make any comment on or around December 29, 2023 about Durayle Jackson's mental state or about whether anyone hoped that he would end up in a mental hospital . . . I absolutely would not have said any of the comments that Durayle Jackson alleges that I did . . . Jail walkies are recorded, so his claims can easily be disproved."); *Id*. at 69 (Exhibit 58, Affidavit of Deputy Adrian Macias) ("I did not make a comment on or around December 22, 2023 about Durayle Jackson's sexuality or whether or not he was a snitch . . . I absolutely would not have made any comments like that about an inmate.").

The Report also provides that various audio recordings from the WCJ radio channel do not

reveal any comments at the time alleged by Plaintiff.  *See, e.g.,* Doc. 22, at 20 ("Review of audio recordings from the WCJ radio channel at around 2 pm on 10/17/23 did not reveal any comments similar to those alleged by Plaintiff."); at 24 ("Review of audio recordings from the WCJ radio channel on 10/24/23 at around 12:58 pm did not reveal any comments similar to those alleged by Plaintiff." ); at 26 ("Review of available audio recordings from the WCJ radio channel on 11/1/23 at around 2:15 pm and 5 pm did not reveal any comments similar to those alleged by Plaintiff."); at 30 ("Review of audio recordings from the WCJ radio channel on 12/21/23 did not reveal any comments similar to those alleged by Plaintiff."); at 31 ("Review of audio recordings from the WCJ radio channel on 12/22/23 at around 11:55 am did not reveal any comments similar to those alleged by Plaintiff.").

## III. Discussion

### 1. Federal Claims

#### A. Eighth Amendment

"Under the Eighth Amendment, prison officials have a duty to 'provide humane conditions of confinement,' including 'tak[ing] reasonable measures to guarantee the safety of . . . inmates.'" *Requena v. Roberts*, 893 F.3d 1195, 1214 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 800 (2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation marks omitted)).  This duty includes "a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (ellipsis and quotation marks omitted).  To prevail on a failure to protect claim, a plaintiff must show:  "(1) 'that the conditions of his incarceration present an objective substantial risk of serious harm' and (2) 'prison officials had subjective knowledge of the risk of harm,' '[i]n other words, an official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Requena*, 893

F.3d at 1214 (citation omitted).

Plaintiff alleges that some of the defendants stated that he smelled like gender dysphoria. The Court found in the M&O that while unprofessional and inappropriate, comments like this do not rise to the level of a constitutional violation. The Tenth Circuit has found that "[m]ere verbal threats or harassment do not rise to the level of a constitutional violation unless they create 'terror of instant and unexpected death.'" *Alvarez v. Gonzales*, 155 F. App'x 393, 396 (10th Cir. 2005) (unpublished) (quoting *Northington v. Jackson,* 973 F.2d 1518, 1524 (10th Cir. 1992)). Where "the officers' comments, although inappropriate, do not suggest a show of deadly force," they fail "to create 'terror of instant and unexpected death.'" *Id.*; *see also McBride v. Deer*, 240 F.3d 1287, at 1291 n.3 (10th Cir. 2001) ("[A]cts or omissions resulting in an inmate being subjected to nothing more than threats and verbal taunts do not violate the Eighth Amendment.") (citation omitted).

However, the Tenth Circuit has held that disclosing an inmate's status as a child molester or "labeling an inmate a 'snitch' or otherwise inciting other inmates to harm an inmate states an Eighth Amendment violation, regardless of whether the inmate is ever actually physically harmed." *Harris v. Matthews*, 417 F. App'x 758, 763 (10th Cir. 2011) (unpublished) (citing *see, e.g., Benefield v. McDowall,* 241 F.3d 1267, 1271–72 (10th Cir.2001) (holding it is clearly established law that labeling an inmate a snitch and informing other inmates of that label with knowledge of the obvious risk of danger associated with that label violates the Eighth Amendment even though the inmate is never actually harmed; "a violation of the Eighth Amendment does not turn on the type [of] relief sought" and "may be implicated not only to physical injury, but also by the infliction of psychological harm"); *Northington v. Jackson,* 973 F.2d 1518, 1525 (10th Cir.1992) (holding plaintiff's claim that he was assaulted by other inmates as a result of a jail guard telling inmates that he was a snitch stated an Eighth Amendment violation); *Brown v. Narvais,* 265

F. App'x 734, 735–36 (10th Cir. 2008) (unpublished) (allegation that defendant disclosed plaintiff's status as a child molester knowing such label would subject the plaintiff to serious bodily harm stated an Eighth Amendment violation even though the plaintiff was never actually physically attacked); *Johnson–Bey v. Ray,* 38 F. App'x 507, 510 (10th Cir. 2002) (unpublished) (plaintiff's allegations that correctional officer intentionally told another inmate that plaintiff had tried to set him up for a disciplinary violation in order to place plaintiff in danger stated an Eighth Amendment violation; "[t]he fact that plaintiff suffered no physical injury resulting from the officer's alleged action, although relevant to the issue of damages, does not require dismissal") (citation omitted); *Purkey v. Green,* 28 F. App'x 736, 745 (10th Cir. 2001) (unpublished) ("A prisoner states an Eighth Amendment violation by alleging that a prison official intended to cause him serious harm by inciting other inmates to do violence against him. While an idle threat of impending physical harm that is not carried out will not suffice to state an Eighth Amendment claim, an imminent threat of serious harm, even though injury never actually occurs, will suffice.") (citation and quotations omitted)).

The Tenth Circuit has further clarified that "allegations of a prison officer's deliberate disclosure of dangerous information about an inmate's status are sufficient to state a claim under the Eighth Amendment provided the alleged danger is facially concrete and plausible enough to satisfy basic pleading standards." *Brown,* 265 F. App'x at 736. This Court has distinguished the facts in *Brown* and held that:

> In *Brown v. Narvais*, the Tenth Circuit addressed a case in which the "conduct and danger complained of [were] materially indistinguishable from that in *Benefield*. 265 F. App'x 734, 736 (10th Cir. 2008) (unpublished). The Tenth Circuit cited *Benefield* for the proposition that although a disclosure has not yet led to an attack on the plaintiff, that fact did not render the pleadings deficient on the object[ive] component of the Eighth Amendment claim— "the existence of a substantial risk of serious harm." *Id.* The Tenth

> Circuit also cautioned that "[w]e also do not hold that disclosure[s] of this sort always in fact create an actionable danger to the inmate, regardless of circumstances that might materially affect the consequences of the disclosure, such as protective action by prison authorities or other contingencies that could negate the potential danger involved." *Id.*

*Leek v. Scoggin*, 2021 WL 4263502, at *3 (D. Kan. 2021) (noting that plaintiff did not allege that he suffered any repercussions from inmate's based on Scoggin's statement or that Scoggin made the statement intending other inmates to injure plaintiff).

"Congress, in enacting the Prison Rape Elimination Act (PREA), recognized an inmate's sexuality (or the perception of their sexuality) could put them at risk for being sexually abused by other inmates." *Harker v. Neyhart*, 2021 WL 3883638, at *3 (D. Colo. 2021) (citing 28 C.F.R. § 115.241(d)(7)). "[L]abeling an inmate as gay is no joke in the lock-up environment . . . [l]ike a prison guard tagging an inmate as a snitch or a pedophile, labeling an inmate as gay could indeed raise a serious risk of harm." *Id.* However, a complaint making such allegations must still establish the subjective prong of the Eighth Amendment analysis and plausibly allege a defendant's subjective knowledge of a risk. *Id.* at *4; *see Perkins v. Kohler*, 2024 WL 402567, at * (E.D. Wisc. 2024) ("Cases from the Seventh Circuit demonstrate that, where the verbal harassment inflicts either physical or psychological pain, takes advantage of a vulnerability, is "not fleeting" or not "too limited to have an impact" but instead is significant or reoccurring, and/or the official is "uniquely situated" to aggravate or cause pain to the prisoner, it can rise to the level of a constitutional violation.") (citing *Beal v. Foster*, 803 F.3d 356, 358–59 (7th Cir. 2015); *Lisle v. Welborn*, 933 F.3d 705, 718–19 (7th Cir. 2019)).

## B.  Right to Privacy

Plaintiff alleges a Fourth Amendment right to be left alone.  Plaintiff cites cases for the proposition that the disclosure of one's sexual orientation is an invasion of privacy. (Doc. 8–1, at

7–9.)  "[T]he Tenth Circuit generally recognizes only a limited right to privacy in the context of prison life." *Williams v. Reed*, 2018 WL 4826219, at *3 (D. Kan. 2018) (citing *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995)).  The Supreme Court has recognized that "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Telesford v. Annucci*, 693 F. App'x 1, 2–3 (2nd Cir. 2017) (quoting *Hudson v. Palmer*, 468 U.S. 517, 527–28 (1984)).  It appears that Plaintiff was a pretrial detainee while housed at the WCJ.

"[T]he Supreme Court has recognized a constitutional right to information privacy under the Fourteenth Amendment, *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977); and the Tenth Circuit Court of Appeals 'has repeatedly interpreted . . . *Whalen* as creating a right to privacy in the non-disclosure of personal information' including confidential medical information." *Keltner v. Bartz*, No. 13-3022-SAC, 2013 WL 761157, at *3 (Feb. 27, 2013) (quoting *Herring v. Kennan*, 218 F.3d 1171, 1175 (10th Cir. 2000), *cert. denied*, 534 U.S. 840 (2001)).  However, prisoners "retain only those rights that 'are not inconsistent with their status as prisoners or with the legitimate penological objectives of the corrections system.'"  *Keltner*, 2013 WL 761157, at *3 (citations omitted).

### C.  Conclusion

Plaintiff alleges that the Defendants made multiple statements during the months he was housed at the WCJ.  Plaintiff's factual allegations conflict with the affidavits submitted with the Report.  The Court cannot ascertain at this screening stage whether or not jail authorities took any action or other contingencies that could negate the potential danger involved.

The *Martinez* report developed as a means "to ascertain whether there is a factual as well as a legal basis for [a] prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987).  The

report "is treated like an affidavit, and the court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citation omitted). The Court "cannot resolve material disputed factual issues by accepting the report's factual findings when they are in conflict with pleadings or affidavits." *Id.* at 1109. "Furthermore, '[a] bona fide factual dispute exists even when the plaintiff's factual allegations that are in conflict with the *Martinez* Report are less specific or well-documented than those contained in the report.'" *Bellamy v. Kansas*, 2024 WL 3718065, at n.5 (10th Cir. Aug. 8, 2024) (unpublished) (quoting *Hall*, 935 F.2d at 1109).

The Court is unable to resolve the factual disputes at this stage of the proceedings and finds that Plaintiff's Eighth Amendment and privacy claims survive screening under 28 U.S.C. § 1915A.

### 2. State Law Claims

Plaintiff raises state law causes of action under Kansas law for invasion of privacy based on false light publicity, negligent infliction of emotional distress, and defamation. (Doc. 8–1, at 5–6, 22.)

### A. False Light

"A false light claim is one of four types of invasion of privacy claims in Kansas." *Schwab v. Kansas Dep't of Children and Families*, 851 F. App'x 110, 115–16 (10th Cir. 2021) (unpublished) (citing *Dominguez v. Davidson*, 266 Kan. 926, 974 P.2d 112, 121 (1999)). "One who gives to another publicity which places him before the public in a false light of a kind highly offensive to a reasonable man, is subject to liability to the other for invasion of his privacy." *Id.* at 116 (citing *Dominguez*, 974 P.2d at 121) (alteration and internal quotation marks omitted)). The Tenth Circuit in *Schwab* cited *Dominguez* as follows:

> The elements of a false light claim are: "(1) publication of some kind must be made to a third party; (2) the publication must falsely

> represent the person; and (3) that representation must be highly
> offensive to a reasonable person." *Id.* (internal quotation marks
> omitted)).   In the context of a false light/invasion of privacy claim,
> "[p]ublicity . . .  means that the matter is made public, by
> communicating it to the public at large, or to so many persons that
> the matter must be regarded as substantially certain to become one
> of public knowledge." *Id.* (internal quotation marks omitted). A
> false light claim fails if "the alleged offensive statements had not
> become common knowledge in the ... public arena." *Id.* (affirming
> summary judgment in the absence of "evidence to show such
> widespread disclosure of private matters as to constitute
> publicizing").

*Schwab*, 851 F. App'x at 116. ""[E]ssential to . . . a false light privacy claim . . . is a determination

that that the matter published concerning the plaintiff is not true." *Talley v. Time, Inc.*, 923 F.3d

878, 894 (10th Cir. 2019) (citing *Rinsley v. Brandt*, 700 F.2d 1304, 1307 (10th Cir. 1983)

(quotations omitted)).

    Plaintiff alleges that since his release from custody, everywhere he goes in public—

including the Olathe library—he receives "scrutiny." (Doc. 8–1, at 3.)  Plaintiff claims that due to

the false light "that was shedded" [sic] he is "known amongst the public as such" and has been

"fired from multiple jobs just off of the defamatory allegations alone."  *Id*.  Plaintiff claims that

his family has turned their back on him due to his stereotypes.  *Id*.  Plaintiff alleges that the false

light "followed [him] into society."  *Id*.  Plaintiff alleges that deputies were saying his name on

their radios, which spread blasphemy throughout the jail.  *Id*. at 4.

    The Report provides that the jail radios are not used as a PA system.  (Doc. 22, at 9.)

Plaintiff has failed to allege how the statements made at the WCJ became public.  He does not

suggest that they were communicated to the public at large or to so many persons that the matter

must be regarded as substantially certain to become one of public knowledge.  Plaintiff should

show good cause why his false light claim should not be dismissed for failure to state a claim.

### B. NIED

Plaintiff also raises a claim for negligent infliction of emotional distress ("NIED"). (Doc. 8–1, at 6.) Plaintiff alleges that Defendant Strader told inmates that they were doing this to Plaintiff hoping that Plaintiff would "end up in a mental hospital." *Id*. at 65. "In order to succeed on an NIED claim, a plaintiff must demonstrate that the extreme and outrageous conduct resulted in direct and proximate physical injury in addition to any emotional discomforts." *Chadwell v. United States*, 2022 WL 3017314, at *5 (D. Kan. 2022) (citing *Price v. City of Wichita*, No. 12-1432-CM, 2013 WL 6081103, at *5 (D. Kan. 2013) (citing *Reynolds v. Highland Manor, Inc.*, 953 P.3d 11, 13 (Kan. Ct. App. 1998))). Furthermore, "Kansas courts have refused to entertain claims for NIED where the physical effects resulting from the emotional distress manifested in headaches, nausea, insomnia, and other general physical and emotional discomforts." *Id*. (citing *Lee v. Kan. State Univ.*, No. 12-cv-2638-JAR-DJW, 2013 WL 2476702, at *10 (D. Kan. June 7, 2013)). "Kansas requires a particularly high showing of physical injuries associated with such distress in an effort to prevent recovery for plaintiffs feigning emotional distress." *Price*, 2013 WL 6081103, at *5 (citing *Reynolds*, 954 P.2d at 13). "Additionally, such physical injuries must be close in time to the initial incident." *Id*. (citing *Hoard v. Shawnee Mission Med. Ctr.*, 662 P.2d 1214, 1221 (Kan.1983) (stating that physical injuries occurring over a month after the incident were too remote from the incident to show causation)).

"Kansas has consistently held that generalized physical symptoms of emotional distress, such as those associated with PTSD . . . are insufficient to state a cause of action for a negligent infliction of emotional distress claim. *Anderson*, 242 Kan. at 860, [752 P.2d 667]." *Majors v. Hillebrand*, 349 P.3d 1283, 1285 (Kan. Ct. App. 2015) (citing *Ware v. ANW Special Educational*

*Co-op. No. 603,* 39 Kan.App.2d 397, 407, 180 P.3d 610 (2008)).  The Kansas Court of Appeals in

*Majors* found that the Kansas Supreme Court had recently held that:

> When determining if injuries may be classified as physical injuries under a NIED cause of action, Kansas courts have addressed various types of symptoms. *See, e.g., Anderson,* 242 Kan. at 860 [752 P.2d 667] (shock, emotional pain, feelings of guilt, nightmares, and depression due to witnessing accident are not compensable physical injuries when there is no actual physical injury); *Hopkins v. State,* 237 Kan. 601, 612–13, 702 P.2d 311 (1985) (weight gain is not a compensable physical injury); *Reynolds v. Highland Manor, Inc.,* 24 Kan.App.2d 859, 861–62, 954 P.2d 11 (1998) (plaintiff failed to meet physical injury requirement when she suffered headaches, diarrhea, nausea, crying, shaking, sexual problems, and feelings of stress, all caused by anxiety); *Dill v. Barnett Funeral Home, Inc.,* No. 90,653 [—— Kan.App. 2d ——], 2004 WL 292124, at *8 (Kan.App.2004) (unpublished opinion), *rev. denied* 278 Kan. 844 (2004) (lack of sleep, recurring dreams, and general fatigue not a compensable physical injury)." *Williams v. Taco Tico, Inc.,* No. 106,088, —— Kan.App.2d ——, 2012 WL 2045369, at *6 (Kan.App.2012) (unpublished opinion) (finding "PTSD, depression, anxiety, insomnia, and nightmares do not qualify as physical injuries"), *rev. denied* 296 Kan. 1136 (2013).

*Majors*, 349 P.3d at 1286.

Plaintiff has failed to allege a physical injury sufficient to state a claim for NIED under

Kansas law.  Plaintiff should show good cause why this claim should not be dismissed for failure

to state a claim.

### C.  Defamation

Plaintiff also alleges defamation.  (Doc. 8–1, at 22.)  "The elements of the tort of

defamation in Kansas are: 'false and defamatory words, communicated to a third party, which

result in harm to the reputation of the person defamed.'"  *Bundren v. Parriott*, 245 F. App'x 822,

826 (10th Cir. 2007) (unpublished) (quoting *Hall v. Kan. Farm Bureau,* 274 Kan. 263, 50 P.3d

495, 504 (2002)).  Plaintiff suggests that his claim is based on "slander per se."  (Doc. 8–1, at 22.)

The Tenth Circuit in *Bundren* noted that the plaintiff's allegation that a defamation per se claim

required no pleading or proof of special damage "appears to be an inaccurate statement of Kansas law." *Bundren*, 245 F. App'x at 826, n.2 (citing *Polson v. Davis,* 895 F.2d 705, 708 (10th Cir.1990) (stating Kansas no longer recognizes defamation per se claims)).

Plaintiff does not set forth any factual allegations under the section titled "Defamation in Kansas." (Doc. 8–1, at 22.)  Plaintiff merely sets forth case law.  *Id*.  The attachment to his Amended Complaint titled "Cause of Action" sets forth his specific allegations.  *See* Doc. 8–1, at 15–29.  Under each allegation, he sets forth whether it supports an Eighth Amendment claim, a false light claim, a NIED claim, a § 1985 claim, or an equal protection claim.  *Id*.  None of the allegations indicate that they support a defamation claim.  *Id*.; *see Jackson v. State Farm Fire and Casualty Co.*,  2025 WL 1707565, at *5 (D. Kan. 2025) (dismissing defamation claim where plaintiff failed to allege any false and defamatory words communicated to a third party and failed to identify how or why the words would be made public).

Plaintiff should show good cause why his state law claims should not be dismissed for the reasons stated in this Memorandum and Order.  Failure to respond by the deadline may result in the dismissal of these state law claims for failure to state a claim.

## IV.  Response Required

Plaintiff is ordered to show good cause why his state law claims should not be dismissed.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff is granted until **December 12, 2025,** in which to show good cause, in writing to the undersigned, why Plaintiff's state law claims should not be dismissed for the reasons stated herein.

**IT IS FURTHER ORDERED** that the Clerk is directed to redact Plaintiff's social security number and date of birth on Doc. 22–1, at 1.

**IT IS FURTHER ORDERED** that the Clerk is directed to correct the Defendants' names on the docket as follows:  Jonathan Okeke shall be changed to Gabriel Okeke; Eliabeth Pfligier shall be changed to Elizabeth Pfliegier; Elizabeth Huitt shall be changed to Lyndsey Huitt; (fnu) Lopez shall be changed to Michael Lopez; (fnu) Thomas shall be changed to Joshua Thomas; (fnu) Jennings shall be changed to Catherine Jennings; (fnu) Woods shall be changed to Brandon Woods; (fnu) Carlon shall be changed to Fabian Carlon; (fnu) Cole shall be changed to Anita Cole; (fnu) Kelly shall be changed to Lorenzo Kelly; and (fnu) Strader shall be changed to Jonathan Strader.

**IT IS FURTHER ORDERED** that the Clerk is directed to send requests to waive service to Defendants.

**IT IS SO ORDERED**.

**Dated November 12, 2025, in Kansas City, Kansas.**

<u>S/  John W. Lungstrum</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**